1

2                  UNITED STATES DISTRICT COURT

3              FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5
DIANE ANDERSON; DONA CLOUD,
6                                          1:06-CV-1795 OWW SMS
                    Plaintiffs,
7                                          MEMORANDUM DECISION GRANTING
             v.                            DEFENDANTS' MOTION FOR SUMMARY
8                                          JUDGMENT AS TO ALL CLAIMS
                                           AGAINST ALL DEFENDANTS.
9   DAVE SMITH, Clovis Police
    Department; JIM KOCH, Corporal,
10  Clovis Police Department; BETTY
    COCHRAN, Clovis Animal Control
11  Officer; SHAWN KNAPP, Clovis
    Animal Control Officer; STEVE
12  BAKER, Clovis Code Enforcement
    Officer; KEN BAXTER, Clovis Code
13  Enforcement Officer; CITY OF
    CLOVIS; DOES 1-20.
14
                    Defendants.
15

16

17                      I. INTRODUCTION

18       This case arises out of the October 26, 2005 entry into

19  Plaintiffs' residence at 2557 Harvard Avenue in Clovis,

20  California, by members of the Clovis Police Department, Clovis

21  Animal Control Officers, and Clovis Code Enforcement Officers.

22  Plaintiffs' First Amended Complaint ("FAC") alleges seven counts,

23  some of which encompass several causes of action:

24

25           (1) "Violation of Federal Civil Rights (Illegal Entry,

26              Search, Seizure, 4th Amendment Violations)";

27           (2) "Trespass, Invasion of Privacy, Conversion";

28

                                1

(3) "Assault, Battery; Excessive Force";

(4) "Violation of Civil Rights (Due Process), Abuse of

Process (Destruction of Pets Without Notice),

Intentional Infliction of Emotional Distress;

Conversion (Destruction of Pets);

(5) Violation of Civil Rights (Due Process);

Conspiracy; Abuse of Process (Refusal of Access to

Evidence);

(6) Violation of Federal Civil Rights; Conspiracy

(Substantive Due Process: Exclusion From, Loss of Home)

Doc. 6.

Defendants Dave Smith, Jim Koch, Betty Cochran, Shawn Knapp,

Steve Baker, Ken Baxter, and the City of Clovis, move for summary

judgment, arguing with respect to the Fourth Amendment

allegation:  (1) that Plaintiff Dona Cloud consented to the

entry; and alternatively, that the entry was also required

(2) to protect the health and/or safety of a number of animals

residing there in unacceptably unsanitary conditions; and (3) to

protect the health of Ms. Cloud, an elderly woman residing at the

residence, who Defendants claim to have observed outside the

residence with what they believed to be animal feces on her

hands, feet, and person, and an open tracheotomy wound on her

throat.  Defendants also maintain that they are entitled to

summary judgment on all of the remaining claims in the case.

2

1

## II. BACKGROUND

2       Both Defendant Neighborhood Preservation Officer Dave Smith

3  ("Smith") and Defendant Animal Service Officer Betty Cochran

4  ("Cochran") received several complaints concerning the noise and

5  odor coming from Plaintiffs' residence, at 2557 Harvard Avenue,

6  in Clovis, California in the month prior to October 26, 2005.

7  Defendants' Statement of Undisputed Material Fact ("DSUF"), Doc.

8  37-2, #2.  On October 16, 2005, the Clovis Animal Control

9  Department cited Plaintiff Diane Anderson for violations of the

10 Clovis Municipal Code in reference to complaints about dogs

11 barking at and foul odors coming from her property.  Cochran

12 Decl., Doc. 28-4, at ¶5.

13      On October 20, 2005, Smith and Cochran visited Plaintiff

14 Diane Anderson to inform her of the complaints and advise her how

15 to come into compliance.  DSUF #3.  The residence was surrounded

16 by a six foot solid wood fence protecting the front entry.  Smith

17 Decl., Doc. 28-14, at ¶6.  Officer Smith made contact with Diane

18 Anderson by breaching a gate in the fence and knocking on the

19 front door.  *Id*. at ¶9.  Smith could hear that there were

20 numerous dogs "barking incessantly" inside the house.  *Id*.  Diane

21 Anderson answered the door, exited the residence, came outside

22 the enclosed fenced-in area, and spoke with Smith in the front

23 yard.  *Id*.  Cochran and Smith spoke with Diane Anderson, and

24 explained the applicable Municipal Codes to her.  *Id*. at ¶10.

25

26

27

28

Ms. Anderson admitted to having nine or more dogs, and indicated her intent to comply with Smith and Cochran's request that she remove all but three dogs from the residence. *Id*. Ms. Anderson indicated that she would comply with this request and would be ready for re-inspection the following week. *Id*. at ¶10.

On Tuesday, October 25, 2005, Cochran and Smith returned to Ms. Anderson's residence, but were unable to establish contact with anyone. Smith returned the following morning, and was able to contact Ms. Anderson. *Id*. at ¶11. Ms. Anderson came into the front yard through her garage. *Id*. Smith called Cochran to meet them. *Id*. Smith observed unfinished carpentry work, wet floors, and exposed wires in the open garage, all of which were, in his opinion, in violation of the municipal building code. *Id*. Once Cochran arrived, she could smell urine and feces coming from the home. Cochran Decl. at ¶7.

Smith explained to Ms. Anderson that he and Cochran were there to re-inspect her residence. Ms. Anderson stated that she understood, but had not been able to comply with the officers' requests. Smith Decl. at ¶12. Smith told Ms. Anderson that he was not inclined to give her an extension, as there was a "gross violation" of City Ordinances and the neighbors were being inconvenienced. *Id*. Anderson indicated that she understood, but did not know how to solve the problem and that it would take her some more time to find homes for the animals. *Id*.

4

Cochran said it would be better to take the animals to the

Clovis Animal shelter, so they could begin the process of

adopting them out.  Ms. Anderson reluctantly agreed to surrender

the "puppies."  Cochran Decl. at ¶8.  Ms. Anderson refused to

allow the officers inside the house to help evacuate the animals.

Smith Decl. at ¶14.  She made eight trips in and out of the

house, bringing out a total of sixteen puppies.  *Id.* at ¶14.

Officer Smith described the condition of the dogs as follows:

> Each puppy was similar in size and weight and they
> appeared to be six to seven week old shepherd mix
> puppies. The puppies had an extremely foul odor
> and it was obvious they also had significant flea
> infestation and a skin disorder where hair was
> missing, and a rash was visible on the puppies'
> skin. Fleas jumped from the puppies onto my arms
> as I handled them [to Officer Cochran]. The
> puppies appeared very weak and in bad condition
> all the way around. They were sticky to the touch,
> as if they had been soaking in urine.

*Id.* at ¶15.  Officer Cochran has been an Animal Control Officer

for the City of Clovis for eight years, and an employee at a

veterinarian's office for six years before that.  Cochran Decl.

at ¶3.  She possesses a Bachelor of Science degree in Animal

Science and has worked with animals for nearly twenty years.  *Id.*

She described the condition of the animals Ms. Anderson brought

outside as follows:

> I immediately noticed the puppies had a strong
> odor of urine and feces coming from them, there
> was feces matted in the pads of their feet, there
> was excessive flea infestation on each puppy, the
> puppies had scabs covering their bodies due to the
> flea infestation, they were sticky to the touch
> from being soaked in urine over a prolonged period
> of time without cleaning, and they had distended
> abdomens typical of worm infestation. Because of

> my years of experience working with animals I
> recognized the puppies as being very neglected. In
> spite of my years of experience dealing with
> animals I found the condition of the puppies to be
> revolting.

*Id.* at ¶9.

As Ms. Anderson continued to bring puppies out of the

residence, Officer Smith "could still hear dogs barking inside,"

making it "obvious" to him that "there were still more than three

animals inside the residence."  Smith Decl. at ¶16.  "As each set

of puppies came out of the home," Cochran "noticed the odor of

urine and feces becoming stronger."  Cochran Decl. at ¶10.  This

led her "to understand that the smell was coming from the home as

well as the puppies.  I believed at this time, due to my years of

experience, that it was necessary to remove all of the animals

from the home immediately in order to protect them."  *Id.*  By

this time, Corporal Jim Koch had been called to assist with the

investigation.  Smith Decl. at ¶16

While Officer Smith was discussing the circumstances with

Ms. Anderson, she volunteered information about her 73 year old

mother, Dana Cloud, who was living in the residence.  Smith

declares:

> While discussing the seriousness of the circumstances
> with Ms. Anderson, she stated she was frustrated
> because she could not accomplish the task of
> transporting the animals to other locations because her
> mother, a seventy-three-year-old female (plaintiff Dona
> Cloud), was in the residence confined to a wheelchair
> and walker, and spent most of the time laying in bed as
> she recovered from tetanus that begin in June of 2005.
> After further discussion, Ms. Anderson said her mother

6

1
2

had received a splinter from within the residence that became infected, causing the tetanus, and she had been hospitalized for a lengthy period of time.

3
4
5
6
7
8
9
10

*Id*. at ¶17.  "Considering the description of Ms. Anderson's mother living within the residence with such a serious health condition, the unbelievably foul odor emanating from the residence and condition of the puppies removed from the residence, along with the significant number of dogs still within the residence," Officer Smith determined that a health and safety check of Ms. Anderson's mother was required.  *Id*. at ¶18.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Smith told Ms. Anderson that the Officers needed to "inspect the condition of the residence where her mother was convalescing."  *Id.* at ¶19.  According to Smith, Ms. Anderson responded that "she was an in-home service provider for the elderly working for the County of Fresno and she understood the need to provide a safe and healthy environment for the elderly. She also said the condition of the residence was safe and healthy and there was no need for an inspection.  At this time, Ms. Anderson was told the inspection had to occur for the safety of her mother, at which time she said 'fine, I'll bring her to you; stay out of my house.'"  *Id*.  Ms. Anderson went inside the residence and wheeled Dona Cloud outside in her wheelchair.  *Id*. at ¶20.  According to Smith:  "Ms. Cloud had what appeared to be fecal matter on her hands, feet and legs, otherwise she appeared

27
28

in reasonable health, and appeared alert and oriented." *Id*. [1]

Smith notified Adult Protective Services. *Id*. Case Worker Susan Woodward, a social worker, responded to the scene. *Id*. Ms. Woodward concluded that Dona Cloud was in the home of her own free will and that Adult Protective Services would not intervene. *Id*. Smith, however, continued to be concerned for the health of Ms. Cloud and Ms. Anderson because the home was "in violation of several Municipal and Penal Codes." *Id*. at ¶21.

Smith explained to Ms. Anderson "that Section 6.1.503 of the Clovis Municipal Code state[s] [that] every person keeping an animal shall at all times keep cages, yards and other enclosures where the animal is kept in a clean and sanitary condition and shall remove excreta and manure therefrom every day or as often as is necessary so as not to become a nuisance in the neighborhood; and 6.1.503(b) [] states [that] no person shall at any time maintain any lot or other premises in the city upon which any animal is kept in an unsanitary condition or in such condition as to cause the same to be infested with flies or insects or to create any noxious or offensive odor." *Id*. at ¶22.

Smith concluded that "[c]learly the conditions at 2557 Harvard Avenue where humans were living were in severe violation

---

[1]   Ms. Anderson asserts that it was just "dirt" on her mother's hands, feet, and person, because her mother was helping to clean up the backyard. Anderson Decl., Doc. 31, at ¶4. This explanation is considered in view of the fact that Ms. Cloud was confined to a wheelchair. Nonetheless, even if accepted, it does not undermine the reasonableness of the officers' belief, under the circumstances, that the filth observed on Ms. Cloud was feces.

of the City Municipal Code, [] flies at the residence numbered in the hundreds or thousands; fleas were such that every animal and piece of carpet or bedding was visibly infested, and the noxious odor was so apparent that the [neighbors] had been calling for weeks complaining of the odor emanating from 2557 Harvard when the door was open or the air conditioning was on." *Id.* at ¶23. Smith further explained that "the conditions of the residence were not safe or sanitary for her mother or herself." *Id.* at ¶24.

Ms. Anderson explained that she was in the process of refinancing the home and would be able to fix any problems. *Id.* at ¶25. According to Smith, Ms. Anderson gave Smith the contact information for the company that was refinancing the home. Smith then called the mortgage company and asked to speak to the appraiser "in order to interview him with respect to the condition of the home." *Id.* Smith was unable to reach him. *Id.* Ms. Anderson denies ever giving Officer Smith information about her home loan. Anderson Decl. at ¶10. She asserts that Smith must have obtained the information while inside the home. *Id.*

At some point after the puppies and Ms. Cloud were brought outside the residence, Officer Koch conferred with Officer Smith about entering the home to check on the safety of Ms. Cloud and the animals. Koch Decl. at ¶13. Koch believed that they did not need a warrant to do so under an exception to the warrant

requirement.  *Id*.

         According to Smith, as he was explaining his concern
for Dona Cloud's health and safety, "Ms. Cloud spoke up and
said we could enter the home to check on her living
conditions."  *Id*. at ¶26.  Smith recalls that "Ms. Anderson
yelled at Ms. Cloud and told her to 'shut up' because 'you
don't know what you're saying'."  *Id*.  Smith then "told Ms.
Anderson that I would be forced to arrest her if she
continued to threaten her mother."  *Id*.  Both Ms. Anderson
and Ms. Cloud dispute Smith's recollection that Ms. Cloud
consented to inspection of the home.  Anderson Decl. ¶6;
Cloud Decl. ¶1; Ruling on Motion to Suppress in *People v.
Anderson*, Ex. F. to Holland Decl, Doc. 32.[2]

         Smith then explained to Ms. Anderson that the officers
needed to remove the animals from her residence.  *Id*. at
¶27.  Smith recalls that Ms. Anderson gave him "permission
to enter her residence for the sake of removing the
animals."  *Id*.  Ms. Anderson denies this.  Anderson Depo. at
136.  According to Ms. Anderson, she continued to deny the
Officers entry and, as they were approaching the door, she

---

[2]      Defendants argue that Plaintiffs' contrary evidence with respect
to consent should be disregarded because: (1) Ms. Anderson was not
present for the entire time that officer Smith was speaking with Ms.
Cloud; and (2) that Ms. Cloud, who has since been diagnosed with
dementia, is not competent to recant her earlier statements.  These
objections go to the weight of Plaintiffs' counter-evidence, not their
admissibility.  Viewing the evidence in a light most favorable to
Plaintiffs, no consent was given.

said "You are not going in."  *Id*.  She claims that an

officer, possibly Officer Smith, then grabbed her elbow to

prevent her from entering the home.  *Id*.  This forms the

basis of Ms. Anderson's excessive force claim.  She does not

recall that the grabbing of her wrist hurt her in any way.

She was not bruised.  She simply asserts that "it made me

mad."  *Id*. at 182.[3]

Smith's disturbing description of how events unfolded during

the entry into the home is essentially <u>undisputed</u>:

> 28. At this point Betty Cochran, Shawn Knapp, Jim
> Koch, and I, made our way to the front door of Ms.
> Anderson's residence for the purpose of entering
> and removing the unknown number of animals within.
> What took place while removing the animals is very
> difficult to describe, and pictures were taken to
> document the absolute atrocity that was found as
> we entered the front door.

> 29. Upon opening the front door of Ms. Anderson's
> residence, all officers had to step back because
> the odor was so strong. It was necessary that
> everyone obtain a mask in order to try to re-enter
> the home and collect the animals.

> 30. Once inside the residence, numerous dogs (more
> than I was able to count) were running every
> direction within the house, the floors of the
> residence had what appeared to be remnants of
> carpet that were completely disintegrated and
> apparently absorbed into the existing wood floor
> that was wet and saturated with urine and fecal

---

[3]    Defendants attempt to overcome this allegation by pointing out
that Ms. Anderson admitted in her deposition that she was facing the
other way when Officer Smith grabbed her elbow.  Anderson Depo. at 137.
According to Defendants, the fact that she "wasn't watching" Smith at
the time of the contact renders her excessive force and battery claims
unavailable because she fails to "allege sufficient facts to support
the required elements of these allegations."  Doc. 37 at 11.
Defendants cite no authority for the proposition that a person cannot
be the victim of excessive force and/or battery simply because he or
she was not watching the alleged assailant prior to the allegedly
unlawful contact.

matter. As I looked down the hallway, I saw a shovel standing against the wall with fecal matter stacked and smeared three to four feet up the wall.

31. There were numerous dogs in the living room area and I and others began capturing the dogs with catch sticks. During this process, fourteen (14) large breed adult dogs were removed, each of the dogs was clearly unkempt, infested with fleas, had severe skin problems, and was completely non-socialized.

32. After seizure of the fourteen dogs, the inspection of the residence continued. The kitchen was so dirty and deteriorated that it defies description by words alone. There were spider webs so thick it looked like a Halloween decoration. Animals were hiding within the cupboards that had been chewed, scratched and clawed to where they were only partially intact and some cupboards were actually removed.

33. In the living room there was a portable blow-up airbed covered in linen and blankets which were smeared with fecal matter. I was informed by Ms. Anderson this was where her mother had been sleeping. The fecal matter on the bed was in all conditions, some fresh and some dried onto the bedding. It was also obvious from the stains that dogs had been urinating on the side of the bed.

34. Upon entering the hall bathroom, I found adult cats within the room and they appeared to have been locked in there for weeks or possibly months without any cleaning; the bathtub was ¼ full of liquid that was dark black in color and smelled very foul of urine and feces, and the room was so covered in cat urine and feces that I could not move within without slipping. Betty Cochran accomplished the task of removing the cats from the bathroom.

35. Further down the hall was a bedroom with a bathroom which appeared to be "somewhat functioning" in that the water ran, but that bathroom was also covered in fecal matter and urine. There was no possible way of arriving in this room in a sanitary condition or standing within that room in any way to utilize the toilet or shower facilities without standing, walking or handling animal fecal matter and urine.

36. When Ms. Anderson was asked about the master bedroom, she stated this was the bedroom they used

12

1   to sleep in until rats began biting their heads at
   night, at which time they moved into the living
2   room where they were now sleeping. Ms. Anderson
   also said that the end of the house had no
3   electricity because rats had chewed the wiring in
   the attic. I observed the entire end of the house
4   was covered in spider webs, which were very thick.

5   37. Upon entering another bedroom and after
   removing another dog from that room, I found two
6   birds in a cage suspended from the ceiling, one a
   dove and the other a small parrot-type bird. There
7   were also several kittens, possibly just several
   days old on the floor along with one adult cat.
8   Five kittens were removed from that room.

9   38. At this time, I heard a strange sound coming
   from the mattress in the bedroom, and the mattress
10   appeared to start moving and a small Lhasa-type
   dog was found in such terrible condition that its
11   hair was matted and missing, it was blind in both
   eyes and it was unable to open its mouth due to
12   the matted hair on its lips. The dog was emaciated
   and barely able to move, so it was taken to a
13   veterinarian by Betty Cochran.

14 Smith Decl. at ¶¶ 28-38.  Officer Cochran described similarly

15 deplorable conditions:

16   15.  I entered the home at 2557 Harvard Avenue to
   collect the animals. In spite of my experience
17   dealing with animals I was overwhelmed by the
   odor. I immediately discovered that I was correct
18   in believing the home was incredibly unhealthy for
   the animals and they were in need of immediate
19   medical rescue from the despicable environment.
   The home was full of feces and urine on the
20   floors, counters, and furniture. The house was in
   a state of disrepair and animals appeared to be
21   all over the home and even living in the
   cupboards.
22

23   16. Of the animals collected, all of the kittens
   died, all of the adult cats except one died from
24   combinations of feline leukemia and compromised
   immune systems. The single cat that was euthanized
25   was later caught in the garage at 2557 Harvard and
   was being eaten by maggots while it was still
26   alive.

27   17. Several of the puppies suffered from upper
   respiratory infection and were given courses of
28   antibiotics as treatment. One of those puppies,

1
2
3
4
5

> Rufus, died in my arms from that infection several
> weeks later. Despite the antibiotics, he was not
> strong enough to recover from the infection
> because his immune system was severely compromised
> due to the e-coli, coccidiosis, roundworms, and
> enterococcus he carried from his time at 2557
> Harvard Avenue. I believe each and every puppy
> would have had severe problems, including possible
> death, if not rescued from 2557 Harvard Avenue on
> October 26, 2005.

6   Cochran Decl. at ¶¶ 15-17 (emphasis added).[4]

7
8       Ms. Anderson does not contradict the essential nature of the

9   Officers' description of the condition of the home or of the

10  animals therein.  Rather, she asserts that, although some of the

11  dogs were "not socialized," none were "vicious."  Anderson Decl.

12  at ¶9.  She claims that some of the officers were abusing the

13  animals as they were collecting them by poking sticks in their

14  mouths and ensnaring them around the neck.  *Id*.  She also

15  maintains that all of the animals were "well fed" and that the

16  "puppies had scrambled eggs for breakfast the day of the

17  incident."  *Id*.  Finally, she asserts that the puppies "had been

18  dewormed but picked up worms again."  *Id*.  She does not dispute

19  the foul smell,[5] the physical condition of the animals, nor the

20
21  unsanitary condition of her residence.

22      Ms. Anderson signed a euthanasia form releasing the animals

23

24  [4]     Plaintiff objects to certain portions of the Cochran Declaration
    on the ground that Cochran is not a licensed Doctor of Veterinary
25  Medicine and is unqualified to offer any veterinary medical opinions
    under Federal Rule of Evidence 701.  *See, e.g.*, Doc. 29 at 5, 12.  This
26  objection is without merit.  Officer Cochran is a proper lay witness
    and has specialized knowledge gained because of her employment.  *See*
27  *U.S. v. Harrison*, 64 F.3d 491, 493 (9th Cir. 1993).
    [5]     Ms. Anderson in fact admitted in her deposition that, at the time
28  of the incident, her sense of smell was not functioning properly.
    Anderson Depo. At 173-74.

to the custody of Animal Control.  Cochran Decl. at ¶12.  Cochran

recalls that, after signing the euthanasia form releasing the

animals, Ms. Anderson pointed at her mother and asked "can you

euthanize her instead?"  Cochran Decl. at ¶12.  Cochran made sure

to have Ms. Anderson sign the euthanasia form because it would

relieve her of having to reimburse the City of Clovis for the

medical care of the animals pursuant to Penal Code § 597.1.  *Id.*

at ¶13.  Ms. Anderson asserts that, although she signed the form,

she did not know what she was signing because she was not wearing

her glasses.  Anderson Decl. at ¶8.  She claims to have told

Officer Cochran that she did not have her glasses.  *Id.*[6]  Ms.

Anderson claims to have handed only the puppies over on the

condition that they would not be killed.  *Id.*  She asserts that

she did not turn the remainder of the animals over voluntarily.

*Id.* at ¶8.

   Despite the fact that the Adult Protective Services worker

who arrived on scene to interview Ms. Anderson and Ms. Cloud

determined that Ms. Cloud was residing in the residence of her

own free will, Corporal Koch and Officer Smith concluded that

---

[6]    Defendants attempt to discount Ms. Anderson's contrary testimony
on this point, emphasizing that, initially, Ms. Anderson claimed to
have written "no glasses" on the back of the Euthanasia form.  She has
now changed her story slightly, maintaining that she simply told
Officer Cochran that she did not have her glasses.  Anderson Decl. at
¶8.  Defendant also cites to Ms. Anderson's deposition testimony, in
which she was presented a copy of the form and asked to read it without
her glasses on.  She was able to do so, but only by bringing the form
close to her face.  Anderson Depo. at 167-68.  These pieces of evidence
go to the weight that a trier of fact would give to Ms. Anderson's
testimony, they do not establish that her version of events is a
"sham," warranting exclusion for purposes of summary judgment.

"conditions of the house were completely uninhabitable and it was not healthy or reasonable to allow Ms. Anderson and Ms. Cloud into the residence." Smith Decl. at ¶39. Smith, who was a sworn building inspector, "was able to conclude that the home violated multiple codes and was dangerous to any occupants" and exercised his "authority to vacate the home until it was brought up to code." *Id.* at ¶40. Although the home was "obviously uninhabitable," Smith contacted City of Clovis Building Inspector Ken Baxter "for a second opinion before taking such an extreme measure as vacating the home." *Id.*

Mr. Baxter examined the premises and concurred with Smith's opinion that the residence was not inhabitable and needed to be condemned. *Id.* at ¶41. Mr. Baxter red-tagged the residence mandating that no person enter until significant structural and mechanical repairs were made. *Id.* Both Ms. Anderson and Ms. Cloud were admonished that if they were to re-enter the residence, they would be arrested for trespassing. *Id.* Building Inspector Baxter explains in his declaration that placing a red tag on a home gives notice to interested parties that there are violations of the code and severe problems within the home. Baxter Decl. at ¶14. He does not recall how he became aware that a lender had an interest in the home, but once he became aware of that fact, he was required to send them notice of the red-tagging pursuant to Uniform Housing Code Section 1101.3. *Id.* at ¶17.

16

Subsequent to the home being "red-tagged" the lender "de funded" the loan.  *Id*. at ¶7.

Steve Baker, a Building Official for the City of Clovis and a state registered quality control engineer, personally visited the residence subsequent to October 26, 2005.  He indicates that the conditions there "were the worst [he has] seen in 30 years of building inspection."  Baker Decl. at ¶4.  He confirmed that the residence was a "danger to the persons living there."  *Id*. at ¶9. He also confirmed that he signed a Notice and Order on October 31, 2005 concerning conditions at the home and that the City was required under the Uniform Housing Code to send copies to all parties with a financial interest in the home.  *Id*. at ¶5-6.

Officer Smith claims to have helped Ms. Anderson retrieve personal items from the residence.  Smith Decl. at ¶42.  Ms. Anderson disputes this.  She states that she was not permitted to retrieve the family car from the garage, nor were they permitted to retrieve personal property, including Ms. Cloud's identification, loan documents pertaining to the refinance, grooming utensils, undergarments, a cell phone, checkbook, ATM card, and medicine.  Anderson Decl. at ¶7.  According to Anderson, the family was told to go to the Clovis Motel and that they would "never" be allowed back in.  *Id*.

Ms. Anderson claims that Defendants refused to provide her with information about the condition of the puppies, access to

those animals, or permission to allow Plaintiffs' veterinarian to examine the animals.  FAC at ¶ 33-34.  Ms. Anderson alleges that law enforcement Defendants "conspired" with other Defendants to deny her access to this "evidence," which "prejudice[d] [] her ability to defend herself in the criminal action.  *Id*. at ¶35.

Ms. Cloud was charged with multiple counts of animal abuse under California Penal Code § 597.1, involving the puppies she brought out of the house voluntarily and the animals found inside the residence.  The state trial court granted her motion to suppress all of the evidence collected from inside the home, including any evidence regarding the animals collected therein. Holland Decl., Doc. 32, Ex. F.  The case was allowed to proceed on the single § 597.1 count involving the puppies Ms. Anderson brought outside the home voluntarily.  Ms. Anderson pleaded no contest to the charge.[7]

### III. STANDARD OF DECISION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party moving for summary judgment

---

[7]  Ms. Anderson asserts that she only pled no contest because she could not afford an attorney.  This is not the proper forum in which to challenge her plea agreement.

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise

provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Id.*

To defeat a motion for summary judgment, the non-moving party must show there exists a genuine dispute (or issue) of material fact.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

## IV. ANALYSIS

A.   Federal Civil Rights Claims.

1.   Section 1983.

Plaintiffs' federal civil rights claims arise under Title 42, United States Code, section 1983 ("Section 1983").  Section 1983 creates a cause of action against any person who, acting under the color of state law, violates rights established by the

Constitution or the laws of the United States.  *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002).  "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).  To prevail on a section 1983 claim, Plaintiff must show (1) Defendants acted under color of state law and (2) violated Plaintiff's federal constitutional or statutory rights.  *Dawson v. City of Seattle*, 435 F.3d 1054, 1061 (9th Cir. 2006)(citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Here, there is no dispute that the various defendants acted under color of law.  The question is whether Defendants violated Plaintiffs' federal constitutional rights.  Plaintiffs assert that they were subjected to an illegal warrantless entry and search of their residence and that items of their property were seized during the course of that search, Doc. 6 at ¶¶ 7-17(a), allegations which implicate the Fourth Amendment.  Defendants assert the defense of qualified immunity.

2.   <u>Qualified Immunity.</u>

The Supreme Court recently summarized the purpose of qualified immunity:

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate

1
2
3
4
5
6
7
8
9

> clearly established statutory or constitutional
> rights of which a reasonable person would have
> known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818
> (1982). Qualified immunity balances two important
> interests-the need to hold public officials
> accountable when they exercise power irresponsibly
> and the need to shield officials from harassment,
> distraction, and liability when they perform their
> duties reasonably. The protection of qualified
> immunity applies regardless of whether the
> government official's error is "a mistake of law,
> a mistake of fact, or a mistake based on mixed
> questions of law and fact." *Groh v. Ramirez*, 540
> U.S. 551 (2004) (Kennedy, J., dissenting) (citing
> *Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting
> that qualified immunity covers "mere mistakes in
> judgment, whether the mistake is one of fact or
> one of law")).

10
11
12
13
14
15
16
17
18

> Because qualified immunity is "an immunity from
> suit rather than a mere defense to liability ...
> it is effectively lost if a case is erroneously
> permitted to go to trial." *Mitchell v. Forsyth*,
> 472 U.S. 511, 526 (1985) (emphasis deleted).
> Indeed, we have made clear that the "driving
> force" behind creation of the qualified immunity
> doctrine was a desire to ensure that
> "'insubstantial claims' against government
> officials [will] be resolved prior to discovery."
> *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2
> (1987). Accordingly, "we repeatedly have stressed
> the importance of resolving immunity questions at
> the earliest possible stage in litigation." *Hunter
> v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

19
20

*Pearson v. Callahan*, 129 S. Ct. 808 (Jan. 21. 2009) (parallel

citations omitted).

21
22
23
24
25
26
27
28

    Deciding qualified immunity normally entails a two-step

analysis.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A court

must ask whether, taken in the light most favorable to the

plaintiff, the facts alleged show the officers' conduct violated

a constitutional right.  *Id*.  In addition, a court must also

inquire whether the right violated was "clearly established" by

asking whether a reasonable officer could believe that the

defendant's actions were lawful under then-existing precedent.
*Id.* District courts have discretion to determine the order in
which these inquiries take place. *Pearson*, 129 S. Ct. at 818-
822.

    The traditional summary judgment approach should be used in
analyzing the first step of the Saucier analysis:

> A court required to rule upon the qualified
> immunity issue must consider, then, this threshold
> question: Taken in the light most favorable to the
> party asserting the injury, do the facts alleged
> show the [official's] conduct violated a
> constitutional right? Where the facts are
> disputed, their resolution and determinations of
> credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-11 (9th Cir.2004)
(internal citations and quotations omitted).  In the second step,
the court must ask whether it would be clear to a reasonable
official that his conduct was unlawful in the situation
confronted.  Although this inquiry is primarily a legal one,
where the reasonableness of the officer's belief that his conduct
was lawful "depends on the resolution of disputed issues of fact
... summary judgment is not appropriate." *Wilkins v. City of
Oakland*, 350 F.3d 949, 956 (9th. Cir. 2003) (citing *Saucier*, 533
U.S. at 216 (Ginsburg J., concurring)).

    Applying the second step of the *Saucier* analysis, a court
must ask whether it would be clear to a reasonable official that
his conduct was unlawful in the situation confronted.  Although
this inquiry is primarily a legal one, where the reasonableness

of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins*, 350 F.3d at 956.[8]

> 3.    **Threshold Issue:  Preclusive Effect of State Court Decisions.**

> a.    State Court Decision on Motion to Suppress.

The state court granted Defendant's motion to suppress all of the evidence gathered from inside the Harvard Avenue residence, rejecting the prosecution's contention that Ms. Anderson consented to the search, and rejecting the argument that there were exigent circumstances justifying entry without a warrant.  *See* Holland Decl., Ex. F.  The government did not argue at that time that Ms. Cloud consented to the search.  *Id*.

The Supreme Court has held that nothing in the language of § 1983 indicates any congressional intent to deny binding effect to a state court judgment when that court, acting within its proper jurisdiction, has given the parties a full and fair

_____

[8]    An officer is entitled to summary judgment if he had a reasonable, though mistaken, view of either the law or the facts.  "An officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular [action] is legal in those circumstances."  *Saucier*, 533 U.S. at 205.  "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  *Id*.  "The converse also is true: Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."  *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).  But, these rules do not displace the traditional summary judgment process.  A court may not resolve on summary judgment disputes that go to the reasonableness of the officer's belief that the conduct was lawful or the credibility of the officer's own recollection of the facts.

opportunity to litigate the federal issue.  *Allen v. McCurry*, 449

U.S. 90, 103-104 (1980).  Under the Full Faith and Credit Act, 28

U.S.C. § 1738, federal courts are required to give a state court

final judgment whatever preclusive effect a state court would

give it.  *See Love v. Correa*, 2009 WL 347276 (D. Haw. Feb. 11,

2009).  Thus, if California courts would preclude relitigation of

the issue, this Court must abide by the same result.  Under

California law, issue preclusion applies if:

> (1) the issue necessarily decided at the previous
> proceeding is identical to the one which is sought to
> be relitigated; and (2) the previous proceedings
> resulted in a final judgment on the merits; and (3) the
> party against whom [issue preclusion] is asserted was a
> party or in privity with a party at the prior
> proceeding.

*People v. Meredith*, 11 Cal. App. 4th 1548, 1555 (1993); *see also*

*Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990).

Here, the issues to be decided are not identical to those

that were at issue during the suppression hearing.  The state

trial judge was called upon to determine whether the officers'

conduct did in fact violate the Fourth Amendment under existing

precedent.  To do this, Judge Gottlieb examined many of the cases

cited by the parties in this case, and determined that, under

those authorities, the officers' conduct violated the Fourth

Amendment.  Here, however, the inquiry required under the

qualified immunity standard is whether the law was clearly

established at the time the officers acted whether their entry

would violate the Fourth Amendment.  This is a subtle but

significant difference that renders the trial court's decision inapposite.

Privity is also required.  "[I]dentity of parties or privity is a requirement of due process of law."  *Clemmer v. Hartford Ins. Co.*, 22 Cal. 3d 865, 874 (1978).  Privity exists where "the non-party is sufficiently close to the original case to afford application of the principle of preclusion."  *People v. Drinkhouse*, 4 Cal. App. 3d 931, 937 (1970); *accord Martin v. County of Los Angeles*, 51 Cal. App. 4th 688, 700 (1997).  The California Supreme Court has held:

> In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.

*Clemmer*, 22 Cal.3d at 875.

There is authority to support a finding that the Officers were not in privity with the prosecution.  A court in this district has surveyed the state of the law on this question before declining to find that law enforcement offers were in privity with the criminal prosecution:

> While the issue of privity must be determined with reference to California law, when dealing with issue preclusion, "it is often appropriate to look to the law as it is generally applied in other jurisdictions for additional guidance [unless] ... the state-law question is not a particularly difficult one." *Haring v. Prosise*, 462 U.S. 306 (1983). California law on privity is anything but clear cut. In looking at issue preclusion in other states, the majority of federal courts have come to the conclusion that privity does

not exist between law enforcement officers and the criminal prosecution. *See, e.g., Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) (applying Oklahoma law); *Tierney v. Davidson*, 133 F.3d 189, 195 (2d Cir. 1998) (applying Vermont law); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050-51 (7th Cir. 1995) (applying Illinois law); *Smith v. Holtz*, 30 F. Supp. 2d 468, 477 (M.D. Pa. 1998) (applying Pennsylvania law). The Eighth Circuit, in a case applying North Dakota law, has found privity to exist between police officers and the criminal prosecution. *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985) ("the deputies in this case can be properly considered in privity with the state in the prior adjudication and thus bound by the state court's determination that the arrest was illegal"). However, the Eighth Circuit's decisions dealing with other states' laws have followed the majority view. *See Turpin v. County of Rock*, 262 F.3d 779, 782-83 (8th Cir. 2001) (applying Nebraska law, "Collateral estoppel cannot be used against the officers in our case, as the officers were neither parties nor in privity with the State in the criminal action and did not have a full and fair opportunity to litigate the issues in the criminal action."); *Duncan v. Clements*, 744 F.2d 48, 51 (8th Cir. 1984) (applying Missouri law, "collateral estoppel is not appropriate in this case because [police officer], the party against whom collateral estoppel is asserted, was neither a party nor in privity with a party to the prior state criminal proceeding").

*Sanders v. City of Bakersfield*, 2005 WL 6267361 (E.D. Cal. Sept. 30, 2005).

Applying claim and/or issue preclusion jurisprudence, the decisions made by Judge Gottlieb in the suppression hearing have no binding effect in this litigation as to the individual officers who seek the protection of qualified immunity.

b.      Application of *Heck v. Humphrey.*

It their opening brief, Defendants suggest that Plaintiff Diane Anderson "must prove she was not convicted of a violation of California Penal Code Section 597.1 or prove that the

conviction was reversed before she may attempt to prove constitutional violations on the part of defendants." Doc. 28-2 at 7. In support of this argument, Defendants cite *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* stands for the proposition that a plaintiff may not bring a § 1983 action if prevailing on that action would call into question the "validity of [an] outstanding criminal judgment[]." *Id*. at 486.

Defendants argue that *Heck* is applicable here because Plaintiff pled guilty to violating Penal Code 597.1 concerning the condition of the puppies. Defendants maintain that the success of Plaintiffs' contention that the warrantless entry of the Harvard Avenue residence was unlawful will require a determination that the puppies were "not the subjects of cruelty which would warrant entry to save the other animals." Defendants' arguments are misplaced. First, Plaintiffs' plea of no contest to the charge concerning the condition of the puppies would not, on its own, justify a warrantless entry. More importantly, Ms. Anderson does not contest the deplorable condition of the puppies. She asserts that they were "well fed," and that they had been "wormed" in the past, but does not contest the overwhelming evidence that they were diseased, soaked in their own urine, and otherwise found to be in a hazardous and life-threatening condition. *Heck* is not implicated in connection with Plaintiffs' Fourth Amendment claims for unlawful entry,

seizure, and use of excessive force.

Among other claims Plaintiff Anderson also alleges that her procedural due process rights were violated because law enforcement officers, as part of the prosecution team, refused to provide Ms. Anderson access to the evidence upon which her prosecution was premised, "even to know what the condition of the puppies was." Doc. 34 at 18. Success on this claim would necessarily call into question the validity of her criminal conviction. Therefore, the procedural due process claim concerning denial of access to evidence is barred by *Heck*. Defendant is entitled to summary judgment on that claim.

4. Section 1983 Claim Concerning The Entry.

Under *Pearson*, the court may examine the second step of the *Saucier* analysis first. 129 S. Ct at 817. This requires a determination of whether a reasonable official would have known that his conduct was unlawful in the situation confronted. "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Id*. at 822. Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins*, 350 F.3d at 956.

Defendants advance several justifications for their entry

29

1   into the residence.  The first, and most compelling, is their

2   contention that extreme and exigent circumstances presenting a

3   clear and present danger to public health and safety justified

4   warrantless entry to protect the lives of the animals remaining

5   in the home after the puppies were found to be in deplorable

6   condition; the health of Ms. Cloud, an elderly woman convalescing

7   in the home; and to abate any occupancy of the residence which

8   was hazardously uninhabitable.

9   

10      The parties largely agree about the relevant authorities.

11  Both cite *Broden v. Marin Humane Society*, 70 Cal. App. 4th 1212

12  (1999), which concerned the warrantless entry into a pet store by

13  an animal control officer responding to reports of stench and

14  flies at the store.  Upon arrival, and based on her experience,

15  the officer concluded that dead animals were rotting inside the

16  store.  *Id*. at 1217.  After trying to locate the owner, the

17  animal control officer, along with police officer back-up,

18  entered the store without a warrant.  *Id*.

19  

20      The court found that "Penal Code 597.1 is a self-contained

21  regulatory scheme covering treatment of animals" permitting,

22  among other things the seizure and impoundment of animals if an

23  officer "has reasonable grounds to believe that very prompt

24  action is required to protect the health or safety" of those

25  animals.  *Id*. at 1216.  The court held that this statutory

26  language "is the equivalent of the exigent circumstances

27  

28  

30

exception familiar to search and seizure law":

> That exception allows entry without benefit of a warrant when a law enforcement officer confronts an emergency situation requiring swift action to save life, property, or evidence. [citations]   There is no litmus test for emergencies; every case must be explained in light of what was known to the officer at the time of entry.

*Id.* at 1220-21.

The *Broden* court extended the exigent circumstances exception, which permits entry when persons inside a structure are in immediate need of aid, to animals:

> There is no question that law enforcement officers may make a warrantless entry of a building when there are reasonable grounds for believing that persons inside are in need of immediate aid. (*E.g., Tamborino v. Superior Court* (1986) 41 Cal. 3d 919, 924.) Section 597.1 clearly contemplates that animals shall receive a similar solicitude. Here, Officer Kane received information from a presumptively reliable citizen complainant (*see People v. Ramey* (1976) 16 Cal. 3d 263, 269), information she verified when she went to the scene. Kane's visit, together with her past experience, gave a whole new dimension to the report of a bad smell; Kane treated the smell as that of dead animals. The fact that flies were trying to get into the building was powerful corroboration for believing dead animals were inside. Kane could not see inside the building. The landlord would be no help because he did not have a key. Repeated attempts to reach Broden were unavailing and, with no answering machine, held no prospect of success. Short of visible slaughter or blood oozing under the door, a more compelling case for immediate entry cannot be imagined. Substantial evidence supports the findings of the hearing officer and the trial court that Kane's warrantless entry was justified by exigent circumstances.

*Id.* at 1222.

An unpublished decision issued by the Northern District of California in a § 1983 case applied *Broden* to permit the warrantless entry into a mobile home under the exigent

circumstances exception.  *Jackson v. Silicon Valley Animal Control Auth.*, 2008 WL 4544455 (N.D. Cal. Oct. 2, 2008).  In *Jackson*, an officer received a complaint about animals in bad health in the Jacksons' mobile home.  He also observed outside the home a dog wearing a diaper to control bleeding and another dog with a broken jaw.  *Id.* at *8.  These circumstances justified warrantless entry under California Penal Code § 597.1.  *Id.*[9]

Plaintiffs argue that both *Broden* and *Jackson* are distinguishable because *Broden* involved the search of a business and *Jackson* the search of a mobile home, not a house.  A distinction may be drawn between the privacy interest one has in a place of business and the privacy interest one has in one's home.  *New York v. Burger*, 482 U.S. 691, 699-700 (1987) ("An expectation of privacy in commercial premises [] is different from, and indeed less than, a similar expectation in an individual's home.").  However, the basic principle applied in *Broden*, the exigent circumstances exception to the warrant requirement, is applicable to non-mobile residences.  *See, e.g., United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004)

Moreover, Plaintiffs' attempt to distinguish *Jackson* because it involved a mobile home is without merit.  Fourth Amendment

---

[9]     Plaintiff correctly points out that the *Jackson* court also found that the search was alternatively justified under the automobile exception to the warrant requirement because the residence was a mobile home.  2008 WL 4544455, *8.  However, this does not diminish *Jackson* as persuasive authority for the proposition that the circumstances were <u>alternatively</u> justified under the exigent circumstances exception.

jurisprudence has carved out a separate exception to the warrant

requirement for automobiles and extended that exception to mobile

homes.  *Cal. v. Carney*, 471 U.S. 386, 393 (1985).  *Carney,* the

seminal case on this issue, created a conclusive presumption of

exigency when the targeted residence is a mobile home on the

ground that the home could be driven away and because there is a

reduced expectation of privacy stemming from the pervasive

regulation of vehicles capable of traveling on the highway.  *Id*.

at 391-92.  Notably, the circumstances in *Carney*, unlike the

circumstances presented here, did not otherwise present an

exigency.  *Id*.

> Exigent circumstances are those circumstances that
> would cause a reasonable person to believe that entry
> was necessary to prevent physical harm to the officers
> or other persons, the destruction of relevant evidence,
> the escape of the suspect, or some other consequence
> improperly frustrating legitimate law enforcement
> efforts.  To prove that such circumstances existed, the
> government cannot rely on speculation about what may or
> might have happened.  Instead, it must point to
> specific and articulable facts which, taken together
> with rational inferences, support the warrantless
> intrusion.  A court, in turn, must view the exigencies
> from the totality of circumstances known to the
> officers at the time of the warrantless intrusion.
> It must consider whether, in light of these
> circumstances, an officer's decision to enter without a
> warrant was objectively reasonable.

*United States v. Black*, 482 F.3d 1035, 1042 (9th Cir. 2007)

(internal citations and quotations omitted).

    Here, the officers arrived at the scene having received

numerous, prior public complaints and reports of foul odors and

33

barking at the residence.  Upon arriving at the residence on
October 26, 2009, they could smell feces and urine from outside
the front gate, and Officer Smith observed violations of the
building code in plain view in the garage once Ms. Anderson came
outside through it.  These observations alone might not have
justified entry.  However, once Ms. Anderson began bringing the
puppies outside, the situation changed.  The dogs were in
horrible physical condition, stank of urine, and were visibly
ill.  Even after all of the puppies had been removed from the
house, Officer Smith could tell there were many more animals
remaining inside.  Both officers noticed that a terrible smell
was coming from inside the house.  At this juncture, even without
the additional, alarming circumstances involving the health of
Ms. Cloud, no clearly established law prohibited the Officers
from entering without a warrant.  To the contrary, the Officers
reasonably believed that entry was warranted under the exigent
circumstances exception as articulated in *Broden* and *Jackson*.

The situation was compounded by the Officers' interaction
with Ms. Cloud, an elderly woman whom the Officers knew was
convalescing in the home after a bout with tetanus.  She was
presented to the officers in a wheelchair with what the Officers
believed to be feces on her person.  Ms. Cloud also had an open
trachiotomy wound.  Although the elder services officer declined
to take action to remove Ms. Cloud from the premises, the

34

Officers reasonably believed, based on undisputed evidence, that Ms. Cloud's health and safety were seriously in jeopardy and reasonably demanded that the home be inspected.  Under the circumstances, the Officers are entitled to qualified immunity as a matter of law because, based on undisputed objective evidence of conditions hazardous to animal and human health and safety, clearly established law authorized their warrantless entry into the residence based on their reasonable belief that the exigent circumstances exception applied.

Defendants are not entitled to summary adjudication on their alternative contention that they had consent to enter the residence, because both Ms. Anderson and Ms. Cloud's consent are disputed.  This is not material to the outcome of the Fourth Amendment claim, however, as only one exception to the warrant requirement need apply.

Defendants also argue, in the alternative, that the Community Caretaking Exception and a provision of the Clovis Municipal code justified entry without a warrant.  Although these are well taken defenses, it is unnecessary to decide these issues to resolve Defendants' motion for summary judgment.


5.   Section 1983 Excessive Force Claim.

Plaintiff Anderson's entire excessive force claim is premised on her allegation that an unnamed officer "grabbed" her

35

elbow to prevent her from blocking the door to the residence as the Officers attempted to enter the home.  Although Defendants dispute whether this occurred, Ms. Anderson's version of the events is accepted for purposes of summary judgment.  Ms. Anderson stated that she suffered no physical injury as a result of this contact.  The contact simply "made her mad."  She does not describe the degree of force nor that a mark or bruise resulted.

Whether excessive force was used during a search is judged under the Fourth Amendment's objective reasonableness standard as articulated in *Graham v. Connor*, 490 U.S. 386, 395 (1989).  *See Wood v. Kitsap County*, 2007 WL 1306548, *8 (W.D. Wash. May 3, 2007).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotation omitted).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  An individual's limited right to offer reasonable resistance is only triggered by an officer's bad faith or provocative conduct.  *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992).

"Not every push or shove, even if it may later seem
unnecessary in the peace of a judge's chambers, violates the
Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations
and citation omitted).  Where the amount of force used was *de
minimis* in light of the asserted government interest, an
excessive force claim may be invalid as a matter of law.
*Nakamura v. City of Hermosa Beach*, 2009 WL 1445400, *11 (C.D.
Cal. 2009) (force used was *de minimis* where, during the course of
arrest, officer told plaintiff to sit down and simultaneously put
his right hand on Plaintiff's shoulder, shoving him to the
ground; and "Plaintiff's buttocks made contact with the ground
but [he] sustained no bruises or cuts").  Here, Plaintiff's only
allegation is that an unnamed officer grabbed her elbow to
prevent her from blocking the door to the house.  She sustained
no injury.  This use of force, if it occurred, was both *de
minimis* and reasonable under the circumstances.  The officer
justifiably entered the home without a warrant and was entitled
to ensure that his entry was not blocked.  Defendants' motion for
summary adjudication of the excessive force claim is GRANTED.

        6.    Section 1983 Due Process Claims.

              a.    Substantive Due Process - Loss of Home.

        Plaintiffs assert that the unlawful acts of Defendants
resulted in the loss of their home in violation of their
substantive due process rights.  This claim is grounded upon

37

Plaintiffs' assertion that their re-finance loan was cancelled because City of Clovis employees, including Officer Smith, contacted their lender.  Plaintiffs suggest that Officer Smith acquired their lender's contact information by reading related documents while he was inside their home.  Plaintiffs do not dispute, however, that once the home was red tagged, Clovis was required under the Uniform Housing Code to notify all parties with a financial interest in the home.  The name and contact information for their lender was a matter of public record, easily determined based on the address and legal description fo the real property.

Plaintiffs cite no authority for the proposition that loss of one's home, without more, implicates a substantive due process right protected by the Fourteenth Amendment.  The Fourteenth Amendment bars "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Under substantive due process jurisprudence, this Clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint."  *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). In this conception, due process encompasses certain "fundamental" rights.  *Reno v. Flores*, 507 U.S. 292, 301-302 (1993).  The right to housing is <u>not</u> a fundamental right.  *Lindsey v. Normet*, 405 U.S. 56 (1972).  Substantive due process also "forbids the

government from depriving a person of life, liberty, or property
in such a way that shocks the conscience or interferes with the
rights implicit in the concept of ordered liberty." *Corales v.
Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (internal citations
and quotations omitted).  There is nothing shocking about the
City of Clovis condemning the Harvard Avenue residence, a public
nuisance, and then complying with the Uniform Housing Code.

> b.   <u>Procedural Due Process.</u>

> (1)   <u>Refusal of Access to Evidence.</u>

Plaintiff Anderson alleges that her procedural due process
rights were violated by Defendants' refusal to provide her access
to or information about the condition of the animals seized from
her residence.  FAC at ¶27.  As discussed above in the section
concerning *Heck v. Humphrey, see infra* Part IV.A.3.b, Defendants
are entitled to summary judgment on this claim because Plaintiff
cannot bring a § 1983 claim that would, if successful, call into
question the validity of her underlying criminal conviction.

> (2)   <u>Destruction of Pets Without Due Process.</u>

Plaintiffs also complain that they were not afforded a post-
deprivation hearing required under California Penal Code §
597.1(f), which provides:

> Whenever an officer authorized under this section
> seizes or impounds an animal based on a reasonable
> belief that prompt action is required to protect the
> health or safety of the animal or the health or safety
> of others, the officer shall, prior to the commencement

39

of any criminal proceedings authorized by this section, provide the owner or keeper of the animal, if known or ascertainable after reasonable investigation, with the opportunity for a postseizure hearing to determine the validity of the seizure or impoundment, or both.

(1) The agency shall cause a notice to be affixed to a conspicuous place where the animal was situated or personally deliver a notice of the seizure or impoundment, or both, to the owner or keeper within 48 hours, excluding weekends and holidays. The notice shall include all of the following:

(A) The name, business address, and telephone number of the officer providing the notice.

(B) A description of the animal seized, including any identification upon the animal.

(C) The authority and purpose for the seizure, or impoundment, including the time, place, and circumstances under which the animal was seized.

(D) A statement that, in order to receive a postseizure hearing, the owner or person authorized to keep the animal, or his or her agent, shall request the hearing by signing and returning an enclosed declaration of ownership or right to keep the animal to the agency providing the notice within 10 days, including weekends and holidays, of the date of the notice. The declaration may be returned by personal delivery or mail.

(E) A statement that the cost of caring for and treating any animal properly seized under this section is a lien on the animal and that the animal shall not be returned to the owner until the charges are paid, and that failure to request or to attend a scheduled hearing shall result in liability for this cost.

(2) The postseizure hearing shall be conducted within 48 hours of the request, excluding weekends and holidays. The seizing agency may authorize its own officer or employee to conduct the hearing if the hearing officer is not the same person who directed the seizure or impoundment of the animal and is not junior in rank to that person. The agency may utilize the services of a hearing officer from outside the agency for the purposes of complying with this section.

(3) Failure of the owner or keeper, or of his or her agent, to request or to attend a scheduled hearing

40

1
               shall result in a forfeiture of any right to a
               postseizure hearing or right to challenge his or her
2
               liability for costs incurred.

3
                 (4) The agency, department, or society employing
               the person who directed the seizure shall be
4
               responsible for the costs incurred for caring and
               treating the animal, if it is determined in the
5
               postseizure hearing that the seizing officer did not
               have reasonable grounds to believe very prompt action,
6
               including seizure of the animal, was required to
               protect the health or safety of the animal or the
7
               health or safety of others. If it is determined the
               seizure was justified, the owner or keeper shall be
8
               personally liable to the seizing agency for the cost of
               the seizure and care of the animal, the charges for the
9
               seizure and care of the animal shall be a lien on the
               animal, and the animal shall not be returned to its
10
               owner until the charges are paid and the seizing agency
               or hearing officer has determined that the animal is
11
               physically fit or the owner demonstrates to the seizing
               agency's or the hearing officer's satisfaction that the
12
               owner can and will provide the necessary care.

13      In this case, no Defendant claims to have provided Ms.

14  Anderson with notice and/or a hearing under section 597.1.

15  Instead, Defendants assert that Ms. Anderson surrendered her

16  ownership interest in the animals by signing the euthanasia form.

17  Doc. 28-2 at 19.  Ms. Anderson denies having knowingly

18  surrendered her interest in all of the animals.  Viewing the

19  facts in a light most favorable to Ms. Anderson, the court must

20  assume that the waiver was invalid because she could not read it

21  without her glasses.  The fact that Defendants may have violated

22  Ms. Anderson's rights under section § 597.1 by depriving her of

23  her pets without a valid waiver of those rights does not

24  necessarily make out a procedural due process claim.

25      The Due Process Clauses of the Fifth and Fourteenth

26  Amendments provide that the government cannot deprive a person of

27

28

life, liberty, or property without due process of the law.   To
trigger Due Process protections, deprivation must be intentional;
negligent deprivation does not violate due process.   *Daniels v.
Williams*, 474 U.S. 327, 330-31 (1986) ("Where a government
official's act causing injury to life, liberty, or property is
merely negligent, 'no procedure for compensation constitutionally
required.'") (citations omitted).

   Here, Plaintiff essentially alleges that she was not
afforded the procedural rights supplied by California Penal Code
section 597.1.   This is insufficient.   Summary judgment on a
procedural due process claim is proper were plaintiff establishes
"only that she was deprived of a liberty interest because
established state procedures were not followed, [and] not that
the established state procedure effected a deprivation."   *Vinson
v. Cambell County Fiscal Court*, 820 F.2d 194, 199 (6th Cir.
1987).   *Paratt v. Taylor*, 451 U.S. 527, 543 (1981), overruled on
other grounds by *Davis v. Williams*, 474 U.S. 327 (1986), rejected
a procedural due process claim based upon "the unauthorized
failure of agents of the State to follow established state
procedure."   The *Paratt* Court, applying Nebraska law, reasoned:

> There is no contention that the procedures themselves
> are inadequate nor is there any contention that it was
> practicable for the State to provide a predeprivation
> hearing. Moreover, the State of Nebraska has provided
> respondent with the means by which he can receive
> redress for the deprivation. The State provides a
> remedy to persons who believe they have suffered a
> tortious loss at the hands of the State. See

Neb.Rev.Stat. § 81-8,209 *et seq.* (1976).
*Id.* at 543.

The Ninth Circuit has determined that California law provides an adequate post-deprivation remedy for property deprivations by the state. *Barnett v. Centoni*, 31 F.3d 813, 816-17 (9th Cir. 1994) (citing Cal. Gov. Code §§ 810-895). Pets are considered property. *Keniston v. Roberts*, 717 F.2d 1295, 1298 (9th Cir. 1983). Ms. Anderson could have, but apparently never invoked California's post-deprivation procedures to obtain relief. Even if she had done so, she nevertheless has failed to demonstrate that those remedies were inadequate in order to maintain a procedural due process action. *See, e.g., Timberline N.W., Inc. v. Hill*, 141 F.3d 1179, *4 (9th Cir. 1998) (Table). Plaintiffs have not attempted to allege that the remedies available under state law are inadequate. They merely allege that Defendants failed to follow established state procedures. This may form the basis for a claim under state law, but does not support a procedural due process claim. Defendants' motion for summary judgment is GRANTED.

7. City of Clovis/*Monell* Liability.

Defendants move for summary judgment on all federal claims against the City of Clovis on the ground that Plaintiffs have not established municipal liability under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690, n. 55 (1978). A local

43

government unit may not be held liable for the acts of its

employees under a respondeat superior theory.  *Id.* at 691.  The

local government unit "itself must cause the constitutional

deprivation."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th

Cir.1992), cert. denied, 510 U.S. 932 (1993).  To maintain a

section 1983 claim against a local government, a plaintiff must

establish the requisite culpability (a "policy or custom"

attributable to municipal policymakers) and the requisite

causation (the policy or custom as the "moving force" behind the

constitutional deprivation).  *Monell*, 436 U.S. at 691-694.

Here, Plaintiffs allege that the City of Clovis failed to

"reasonably hire, well-educate, instruct, train, manage,

supervise and control the conduct of its" officers and

employees," and that "violations of plaintiffs' civil rights were

committed as a result...."  Doc. 6 at ¶5.  A section 1983

plaintiff alleging a policy of failure to train peace officers

must show:

> (1) he/she was deprived of a constitutional right; (2)
> the local government entity had a training policy that
> amounts to deliberate indifference to constitutional
> rights of persons' with whom its peace officers are
> likely to come into contact; and (3) his/her
> constitutional injury would have been avoided had the
> City properly trained those officers.

*Blankenhorn v. City of Orange*, 485 F.3d 462, 484 (9th Cir. 2007).

Plaintiffs have produced absolutely no evidence to support a

deliberate indifference claim.  Nor is there evidence of any lack

of training or supervision of its officers.

In response to the motion for summary judgment, Plaintiffs assert that their claim against the City of Clovis should survive because the City relied upon a "facially unconstitutional city ordinance" for their actions.  As the entry of the residence was justified under the exigent circumstances exception to the warrant requirement, Defendants need not rely on the Clovis Municipal Code to justify entry.  Accordingly, Plaintiffs' claim against the City of Clovis arising out of the Clovis Municipal Code is moot.  Defendants are entitled to summary judgment as to Plaintiffs' claims against the City of Clovis

   8.   Federal Conspiracy Claim.

Plaintiffs' sixth count alleges a "violation of federal civil rights" based on a conspiracy.  FAC at 16.  Specifically, Plaintiffs allege that the named Defendants conspired with the prosecuting attorney to violate California Penal Code § 1054.1 and the duty to preserve evidence.  For the reasons set forth above, any claim based upon the failure to preserve evidence is barred by *Heck*.  Title 42 U.S.C. § 1985(3) permits a private right of action against two or more actors who conspire to deny Federal Civil rights.  However, to prove a violation of section 1985, a plaintiff must prove "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.  The conspiracy, in other words, must aim

at a deprivation of the equal enjoyment of rights secured by the law to all." *Orin v. Barclay,* 272 F.3d 1207, 1217 (9th Cir. 2001) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). No such evidence is presented here.

B.    State Law Claims.

The FAC also alleges numerous, related state law claims, including Trespass, Invasion of Privacy, Conversion, Assault, Battery, Abuse of Process, Intentional Infliction of Emotional Distress, Conspiracy, and Interference with Prospective Economic Advantage.  The Assault and Battery claims fail as a matter of law because the allegedly offensive contact was justified under the circumstances. *See, e.g.*, *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1248 (2007) (citing Cal. Penal Code § 835a for the proposition that "a battery is not committed by a police officer unless the plaintiff proves the officer used unreasonable force").

A federal court has discretion to exercise jurisdiction over state law claims after dismissing every claim over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007).  The district court declines to exercise jurisdiction over the remaining state law claims, which

46

involve the application of state law doctrines to efforts by City of Clovis personnel to address what are essentially community issues.

V. <u>CONCLUSION</u>

For the reasons set forth above, Defendants are entitled to summary judgment on all of the federal claims in this case. Defendants are also entitled to summary judgment on the state law assault and battery claims.  The district court declines to exercise its jurisdiction over the remaining state law claims. Defendants shall submit a form of order consistent with this memorandum decision within five days of electronic service.


SO ORDERED

Dated:  July 10, 2009


                            ___/s/ Oliver W. Wanger_____
                               Oliver W. Wanger
                            United States District Judge.